**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION**

| | |
|---|---|
| **ARNULFO REYES, et al.,** | **Case No. 2:24-cv-00073-AM** |
| ***Plaintiffs,*** | |
| **v.** | |
| **DANIEL DEFENSE, LLC, et al.,** | |
| ***Defendants.*** | |

**FILED**
September 30, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: AM
DEPUTY

**RESPONSE TO DEFENDANTS EOTECH, LLC'S AND PROJECT ECHO HOLDINGS, LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF NO. 46)**

## INTRODUCTION

Defendants EOTech, LLC and Project Echo Holdings, LLC ("the defendants") – together with defendant Koucar Management, LLC – are Michigan companies that manufacture, market, and sell holographic weapons sights that they promote as "close-quarter battle sights." ECF No. 36-1, Proposed First Amend. Compl. (hereafter, "FAC")[1] ¶¶ 61-64, 323, 330-31. These sights are state-of-the art combat sights, designed for, and used by, military special forces. *Id.* ¶ 323. In the defendants' own words, the "singular purpose" of these sights is killing enemy combatants in "close-quarter engagements with fast-moving targets," *id.* ¶ 329, and – more precisely – to enable an attacking force to neutralize enemy combatants by shooting them first, *id.* ¶¶ 323, 329, 334-37. They are designed for elite special forces units breaching rooms to kill terrorists. *Id.* ¶ 334. The Navy SEALs who killed Osama Bin Laden used the defendants' close-quarter battle sights. *Id.* ¶ 336. For those deadly professionals, close-quarter battle sights provide unrivaled accuracy, speed of target acquisition, and situational awareness, enabling them to "acquire and hit the target before the target acquires [them]." *Id.* ¶¶ 323, 331.

The defendants marketed these military sights – designed to kill enemy combatants abroad – to American civilians for assaultive uses at home. And the defendants targeted teen boys with this message by marketing to them through Call of Duty, other first-person shooting games, and blockbuster action movies. FAC ¶ 341. The marketing worked as intended on the Uvalde Shooter. Not only did he purchase the defendants' sight and have it installed on a Daniel Defense AR-15 – thereby acquiring the exact loadout the defendants had marketed to him – he put that combination to use exactly as the defendants marketing said that he should: through a

[1] Plaintiffs cite to Plaintiffs' proposed amended complaint. *See* ECF No. 36 (Opposed motion to amend complaint).

close-quarter assault on human targets. Although the Shooter had never fired a firearm before the day her carried out the shooting, by using the close-quarter battle sight, he was able to recreate a scenario that he was deeply familiar with: a point-and-shoot gaming experience. *Id.* ¶ 323. The sight also gave the Shooter the "look" – as a Call of Duty lone-gunman – that he desired to carry out the shooting. *Id.* ¶ 352

The defendants had complete control over their marketing. They chose the message, the medium, and the target demographic. Instead of promoting the sight's lawful use, such as for home defense or hunting, they made the astonishing choice to promote the sight's criminal desirability, showing it used for assault, and guaranteeing its deadliness. The defendants knew precisely the risk they were creating by marketing the close-quarter battle sights to teen boys in this way. They did it anyway because it opened a new market for their niche product. Now, when the foreseeable tragic results of their negligence have caused twenty-one deaths, they ask the Court to dismiss the plaintiffs' claims against them. The defendants' arguments are wholly without merit. Under Texas law, the defendants had a duty not to market and sell their close-quarter battle sights in a manner that increased the "existence of reason to anticipate injury." *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 847 (Tex. App. – San Antonio 1989, writ denied). The carnage that resulted from the defendants' negligence was entirely foreseeable and their negligence was a proximate cause of the plaintiffs' harm.

Moreover, PLCAA provides no protection for the defendants' negligence. PLCAA does not apply to any of the plaintiffs' claims against the defendants. The defendants are not protected "manufacturers" or "sellers" under PLCAA. And even if they were, the close-quarter battle sight is not a protected "qualified product" under PLCAA.

The defendants' motion to dismiss must be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Close-Quarter Battle Sight: a Special Forces Tool to "Neutralize the Threat with Turbocharged Speed"

The defendants' close-quarter battle sights are optimized for a "singular purpose": fast-paced, close-quarter killing in military combat. *E.g.*, FAC ¶¶ 323, 327, 331. They are designed to enable military operators conducting lightning assaults to target and kill enemy combatants before the enemy has time to respond. *Id.* These sights are "battlefield proven," and the choice of America's most "elite" special forces warriors. *Id.* ¶ 331. They are not hunting scopes; they provide no magnification. *Id.* ¶ 323.

The defendants' sights project a targeting reticle onto holographic film in a glass viewing window. *Id*. This allows the user to aim with both eyes open, allowing an unrestricted field of view and peripheral vision. *Id.* This allows enemies to be visualized, targeted, and terminated in split seconds. *Id.* ¶ 323. The defendants' tagline for their close-quarter battle sights is "NEUTRALIZE THE THREAT WITH TURBOCHARGED SPEED." *Id.* ¶ 328.

The defendants' battle sights provide a "point-and-shoot" experience, eliminating the intricacies of aiming with traditional iron sights and turning shooting into a real-life video game. FAC ¶ 232. There is no better sight for killing as many people as possible, as quickly as possible, in a terrorist hideout, enemy bunker, or, in this case, a fourth-grade classroom. *Id.*

### B. Defendants Marketed the Close-Quarter Battle Sight to Teen Boys for Assault

Assault is illegal in Texas. But that did not stop the defendants from marketing their product for assault. The defendants supply close-quarter battle sights to the United States military. FAC ¶ 332. But in the pursuit of greater profits, they have chosen to market and sell their "battlefield proven" sights to civilians. FAC ¶ 331. And not just any civilians.

Case 2:24-cv-00073-AM Document 47 Filed 09/12/24 Page 5 of 27

The defendants market their close-quarter battle sights through first-person shooting video games, and especially Call of Duty. FAC ¶ 342-45. The defendants have arranged for their sights to appear in multiple iterations in the Call of Duty franchise. *Id.* ¶¶ 199, 201, 327. The sights are useable – and highly coveted – by players of Call of Duty, who use them to dominate and kill other players. *Id.* ¶¶ 215, 326, 327. Using the defendants' sights in video games gives players, in the defendants' own words, "real world training" with the sights. *Id.* ¶ 343. As a result, the defendants build brand loyalty and a market for their battle sights among civilian players of Call of Duty. *Id.* ¶ 342. There is no doubt that the defendants know that millions of these players are children and teens. *Id.* ¶¶ 212-14. By marketing their sights through Call of Duty, the defendants know they are marketing to minors and emphasizing to them the assaultive virtues of their sights. *Id.* ¶ 341-42. The defendants have ensured that countless simulated headshots and eviscerations have been achieved by teen boys playing Call of Duty and using assault rifles equipped with the defendants' close-quarter battle sights. *Id.* ¶ 327. In the process, these children and teens have become trained and habituated to using the defendants' sights in the frenetic and often indiscriminate violence that is the hallmark of Call of Duty. *Id.* ¶ 215.

The defendants also market on Instagram and other social media platforms. They use Instagram to advertise video clips of players using their sights in video games and they post images of their sights appearing in blockbuster movies. FAC ¶¶ 341-45. The defendants post advertisements on Instagram marketing their sights as "breach-ready," meaning that they are designed for bursting into a room to surprise and kill enemy combatants. *Id.* ¶ 334. They market the round targeting-reticle that appears in every close-quarter battle sight as the "donut of death." *Id.* ¶ 330. Their Instagram marketing includes a clip of a soldier firing an assault rifle equipped with a close-quarter battle sight into a civilian SUV with the caption, "Just let it loop, over and

over again— you know you want to." *Id.* ¶ 335. In another Instagram advertisement, the defendants show a slow-motion video of a man walking with a rifle while the narrator threatens in a guttural voice: "I am a warrior, a destroyer, a force of pure violence, and all that I desire is the sheer glory of victory. Mercy is for the weak. Surrender for those who have no conviction. I am coming for this world and all it has to offer. Nothing will stop me." FAC ¶ 337.[2] The defendants have also joined forces with the Daniel Defense defendants to repeatedly market the combination of their close-quarter battle sights with Daniel Defense AR-15s. *Id.* ¶¶ 346-50. One such Instagram advertisement celebrated this combination as "totally murdered out." *Id.* ¶¶ 153, 348.

This marketing makes clear that the defendants' sights are designed for assault, not hunting or self-defense. "Breaching," *id.* ¶ 334, is a military tactic for using overwhelming firepower and the element of surprise to quickly kill enemy soldiers inside a room. A soldier firing an assault rifle into a civilian vehicle, *id.* ¶ 335, is not engaged in self-defense. Nor is someone who purports to be "a destroyer, a force of pure violence." *Id.* ¶ 337.

Instagram enables advertisers, like the defendants, to market directly to teens and young men. FAC ¶¶ 191, 193, 197, 341-42. By using Instagram to market their sights, the defendants are marketing the assaultive use of their battle sights to teens and young men, and the defendants know this. *Id.* Indeed, they have chosen to market using subjects that are particularly attractive to teen boys, such as Call of Duty and action movies. *Id.* And the defendants have chosen not to institute any age verification measures on their website, which means that minors can browse

---

[2] Unlike the other advertisements described here, this advertisement appeared after the Robb Elementary Shooting. Whether similar advertisements appeared prior to the shooting will be a subject of discovery. Other defendants in this case deleted some of their most wrongful Instagram advertisements after the shooting. *See* FAC ¶¶ 159, 221. It is currently unknown whether EOTech, LLC and Project Echo Holdings, LLC did the same.

their webstore, view marketing, and even – as the Shooter did when he was seventeen – purchase a close-quarter battle sight, *Id.* ¶ 340.

### C. The Defendants' Marketing Worked as Intended on the Uvalde Shooter

The Shooter, who was a call of Duty player from a young age, and who compulsively used Instagram, was a prime target for the defendants' marketing. FAC ¶¶ 283, 276. He was exposed to their marketing. *Id.* ¶ 351; *see also id.* ¶¶ 283-87. And this led to him purchasing the close-quarter battle sight directly from the defendants' webstore in April 2022, when he was still seventeen years old. *Id.* ¶¶ 322, 351. And when the Shooter purchased and picked up his Daniel Defense AR-15, he had the defendants' close-quarter battle sight installed on the AR-15. *Id.* ¶ 347. Doing so, he recreated the exact loadout – a Daniel Defense AR-15 equipped with the defendants' close-quarter battle sight – that the defendants had marketed to him. *Id.* ¶¶ 346-50.

What happened next was entirely foreseeable. That teen, only eight days after turning eighteen, used the defendants' sight on that Daniel Defense AR-15 to launch a close-quarter assault on Robb Elementary School. He "breach[ed]" the classrooms of Robb Elementary School and put the defendants' "donut of death" to use. FAC ¶¶ 330, 334. He "neutralize[d]" his targets in a "close-quarter engagement[]." FAC ¶¶ 328-29. He was "a warrior, a destroyer, a force of pure violence." *Id.* ¶ 337. He used his years of "real world training" with close-quarter battle sights in Call of Duty to live out his own first-person shooting. *Id.* ¶ 343. Nineteen children and two teachers died as a result.

## II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion, the Court must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff ... and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise,*

*L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them … and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co.*, 231 F.R.D. 493, 498 (W.D. Tex. 2005) (citation omitted). To defeat a Rule 12(b)(6) motion, the complaint need only include sufficient factual allegations "to raise a right to relief above the speculative level" and to provide "fair notice" of the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## III. ARGUMENT: THE MOTION TO DISMISS MUST BE DENIED

### A. The Defendants Promote Criminal Uses of Their Sight

Murder, assault, and threatening with a firearm are crimes. Texas defines the felony of aggravated assault as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another," or "intentionally or knowingly threaten[ing] another with imminent bodily injury," while "us[ing] or exhibit[ing] a deadly weapon" TEX. PENAL CODE §§ 22.01, 22.02. An assault committed as part of a mass shooting, which Texas defines as the "discharge of a firearm to cause serious bodily injury or death, or to attempt to cause serious bodily injury or death, to four or more persons ... during the same criminal transaction," is a first-degree felony. TEX. PENAL CODE §§ 1.07(30-a), 22.02. It is felony deadly conduct to "knowingly discharge[] a firearm at or in the direction of … one or more individuals." TEX. PENAL CODE § 22.05. It is also felony deadly conduct to discharge a firearm at or in the direction of "a habitation, building, or vehicle" when "reckless as to whether the habitation, building, or vehicle is occupied." TEX. PENAL CODE § 22.05. Even threatening display of firearm is illegal: it is misdemeanor disorderly conduct to

"display[] a firearm or other deadly weapon in a public place in a manner calculated to alarm." TEX. PENAL CODE § 42.01.

The defendants market the close-quarter battle sight for assault. They show the battle sight affixed to an AR-15-style rifle and promote the sight's advantages when the weapon is used to attack, conduct constituting aggravated assault and felony deadly conduct in violation of TEX. PENAL CODE §§ 22.01, 22.02, 22.05. Reinforcing this message, the defendants teach that first-person-shooter games in which players kill other players are "real world training" for the sight's use, promote it as "breach-ready," and affirm that the "singular purpose" of the sight is to "neutralize" others. This marketing is exactly as brazen as it sounds. To "breach" a building and attempt to "neutralize" its occupants with a firearm is aggravated assault, felony deadly conduct, and, if loss of life results, murder. TEX. PENAL CODE §§ 22.01, 22.02, 22.05, 19.02. If four or more people are in the room, it is a first-degree felony mass shooting aggravated assault, and again, if loss of life results, murder. *See id.*

### B. The Plaintiffs Have Stated Texas Common Law Claims for Negligence

#### 1. Texas Law Recognizes the Defendants' Duty of Reasonable Care in Marketing and Selling the Battle Sight Under Circumstances that Foreseeably Result in Harm to Third Parties

In the age of mass shootings, the defendants promoted their sight for criminal assault in close quarters to teenagers. The Uvalde Shooter used the defendants' sight as advertised to commit a close-quarters assault at Robb Elementary School. Now, despite this patently foreseeable outcome, the defendants argue that they owed ***no duty at all*** to the children who died as a result. The defendants' argument defies the most basic rules of duty and foreseeability. Under the defendants' argument, Ford Motor Company could run advertisements showing an F-150 being used to run down pedestrians, and when someone used an F-150 to do exactly that,

Ford would owe no duty to those injured. Louisville Slugger could advertise its baseball bats for street brawls and muggings, and when someone used a bat for exactly that purpose, Louisville Slugger would owe no duty to those injured. Lego could run advertisements showing children placing Lego bricks in their mouths, and when a child did just that and choked, Lego would owe no duty to the injured child. That none of those companies would ever do such a thing highlights just how beyond the pale the defendants' marketing was. Promoting crime is aberrant conduct. But the unprecedented nature of the defendants' marketing is no reason for the Court to conclude they owed no duty to the plaintiffs.

Under Texas law, there is a "general duty to exercise reasonable care to avoid foreseeable injury to others." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). Thus, "every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *El Chico Corp.*, 732 S.W.2d at 315; *Strakos v. Gehring*, 360 S.W.2d 787, 794 (Tex. 1962) (same); *see also El Chico Corp.*, 732 S.W.2d at 312 ("[I]if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others."); *Buchanan v. Rose*, 138 Tex. 390, 391-92, 159 S.W.2d 109 (1942) (same); Restatement (Second) of Torts § 281, cmt e ("Conduct is negligent because it tends to subject the interests of another to an unreasonable risk of harm."); *see generally Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 549–50 (Tex. 1985).

In the context of the sale of firearms, Texas courts recognize this general duty as a "duty of ordinary care" where the sale could result in "foreseeable injury to a third party." *E.g.*, *Peek v.*

*Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 847 (Tex. App. – San Antonio 1989, writ denied).[3] This duty "rests primarily upon the existence of reason to anticipate injury." *Id.*

The defendants concede that, in selling the close-quarter battle sight, they owed this duty of reasonable care to third parties injured when the sight was "later used in a criminal act" where the defendants "knew or should have known that the sale was likely to result in the criminal act." ECF No. 46, Mtn. to Dismiss (hereafter, "MTD") at 9-10 (citing *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. – Corpus Christi-Edinburg 1997, pet. denied)). Moreover, the defendants do not dispute that Texas law recognizes manufacturers' duty to market their products with reasonable care, and that this duty is owed to third parties who are foreseeably harmed as a result of the breach of that duty. *See Ethicon Endo-Surgery, Inc. v. Gillies*, 343 S.W.3d 205, 211-13 (Tex. App. – Dallas 2011) (negligent marketing claim where manufacturer marketed medical device to physician, who used it on patient, and patient sustained injury as a result); *Carrion v. Ethicon Endo-Surgery, Inc.*, No. CIV.A. C-11-19, 2011 WL 649596, at *2 (S.D. Tex. Feb. 11, 2011) (same); *see also Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 309 (Conn. 2019) (noting "the well established duty of firearms sellers to market their wares legally and responsibly").

[3] *See also Hulsebosch v. Ramsey*, 435 S.W.2d 161, 163-64 (Tex. Civ. App. – Houston [14th Dist.] 1968, no writ); *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. – Corpus Christi-Edinburg 1997, pet. denied); *Tisdale v. Pagourtzis*, No. 3:20-CV-140, 2020 WL 7170491, at *5 (S.D. Tex. Dec. 7, 2020); *Rodriguez v. Acad., Ltd.*, 694 S.W.3d 780, 786-87 (Tex. App. – Houston [14th Dist.] 2024, pet. denied); *Diggles v. Horwitz*, 765 S.W.2d 839, 841 (Tex. App. – Beaumont 1989, writ denied); *Bryant v. Winn-Dixie Stores, Inc.*, 786 S.W.2d 547, 550 (Tex. App. – Fort Worth 1990, writ denied); *Love v. Zales Corp.*, 689 S.W.2d 282, 284 (Tex. App. – Eastland 1985, writ ref'd n.r.e.); *Reyna v. Acad. Ltd.*, No. 01-15-00988-CV, 2017 WL 3483217, at *7 n.8, *7-8 (Tex. App. – Houston [1st Dist.] Aug. 15, 2017, no pet.); *Morin v. Moore,* 309 F.3d 316, 327-27 (5th Cir. 2002); *Kennedy v. Baird*, 682 S.W.2d 377, 378-79 (Tex. App. – El Paso 1984, no writ); *cf. McLain v. Hodge*, 474 S.W.2d 772, 777 (Tex. Civ. App. – Waco 1971, writ ref'd n.r.e.).

But the defendants argue that, notwithstanding their conceded duty of reasonable care, the facts alleged do not show that the harm that resulted here was foreseeable.[4] *See* MTD at 10. The defendants ignore the detailed allegations showing that they had every "reason to anticipate injury," *Peek*, 768 S.W.2d at 847, as a result of their marketing of the close-quarter battle sight to teenagers for assault. *See* FAC ¶¶ 327-49. "The most directly foreseeable harm associated with such advertising is that innocent third parties could be shot as a result." *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 291 (Conn. 2019). That is what happened.

"Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission." *E.g.*, *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018). "Foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Companies spend money devising and deploying marketing schemes for one reason and one reason only: they work. Marketing changes consumer behavior. These are fundamental principles of marketing, and the defendants plainly understood them, because they invested heavily in marketing. *See* FAC ¶¶ 323, 328-37, 342-49. When companies like the defendants create marketing showing how their products should be used, it is not just foreseeable but predictable that consumers will use the products in that way. For that reason, when marketing, such as the defendants', "models or encourages illegal or unsafe behavior, … the immediate victims are just as likely to be third parties who are not customers, whether it be individuals who engage in inappropriate conduct inspired by the advertisements or the direct victims of that conduct." *Soto*, 202 A.3d at 291; *see also Weirum v. RKO Gen., Inc.*,

[4] Thus, ***at best***, the defendants' duty argument raises a fact issue for the jury. *See Reyes v. Dollar Tree Stores, Inc.*, 221 F. Supp. 3d 817, 826 (W.D. Tex. 2016) ("[I]f the essential facts about foreseeability as an element of ... duty are disputed, the question is a fact issue for the jury.").

539 P.2d 36, 40 (Cal. 1975) (where radio station with "extensive teenage audience" broadcast contest urging listeners to be the first to an area announced on air, station owed a duty to individual harmed by speeding listeners because "[i]t was foreseeable that defendant's youthful listeners, finding the prize had eluded them at one location, would race to arrive first at the next site and in their haste would disregard the demands of highway safety"); *In the Matter of Uncle Ben's, Inc.*, 89 F.T.C. 131, 136 (1977) (prohibiting advertising that shows children cooking food unsupervised because it "has the tendency or capacity to induce behavior which is harmful or involves an unreasonable risk of harm"); *In the Matter of Mego Int'l, Inc., et al.*, 92 F.T.C. 186, 189-90 (1978) (prohibiting, for the same reason, advertising showing young children using electrical appliances near water); *In the Matter of Amf Inc.*, 95 F.T.C. 310, 313-15 (1980) (prohibiting advertising showing children riding bicycles in a dangerous manner).

The defendants' argument that they did not know what "the Shooter in particular intended to do," MTD at 10, is irrelevant. The defendants modeled the use of their sights for assaultive combat to young, male buyers. It was not just foreseeable – but absolutely predictable – that a teenager would be influenced by their marketing to use the sight to carry out an assault with a loaded weapon. It was equally foreseeable that the defendants' encouragement of real-life Call-of-Duty role play with their sights would have lethal results. "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Restatement (Second) of Torts § 302B (1965). While knowledge of a specific third person's propensity to cause harm may support the conclusion that the actor knew or should have known of an unreasonable risk of harm, there is no ***requirement*** that the actor know of the third person's propensities. *See Bicknell v. Lloyd*, 635 S.W.2d 150, 152

(Tex. App. – Houston 1982) (owner of electric cart that was attractive to boys owed duty to third party injured when boys drove cart without authorization because it was foreseeable that third parties could be harmed by owner's failure to remove keys from ignition when leaving cart unattended); *see also Weirum v. RKO Gen., Inc.*, 539 P.2d 36, 40. Instead, a duty arises when, *inter alia*, "the actor acts with knowledge of peculiar conditions which create a high degree of risk of intentional misconduct." *Id.* cmt H. Accordingly, "[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." *Id.* § 449; *see Reyes v. Dollar Tree Stores, Inc.*, 221 F. Supp. 3d 817, 826-27 (W.D. Tex. 2016) (same, and collecting cases).

The defendants' affirmative conduct in marketing their close-quarter battle sight to teen boys for assault created and increased the risk of exactly what happened at Robb Elementary. The defendants' duty not to create and increase the risk of such a mass shooting was clear.[5]

### 2. The Plaintiffs Have Pleaded Specific Facts Supporting Causation

Causation is a question of fact. *See Ryder Integrated Logistics, Inc. v. Fayette Co.*, 453 S.W.3d 922, 929 (Tex. 2015). It can only be resolved as a matter of law when "reasonable minds cannot differ." *Id.* Under Texas law, "[p]roximate cause has two elements: cause in fact and foreseeability." *Reyes*, 221 F. Supp. 3d at 832. "[T]he foreseeability analysis under duty is the same as the foreseeability analysis under proximate cause." *Id.* "Cause in fact means that the act

[5] Because the defendants concede that they owe a duty of reasonable care in selling the close-quarter battle sights and do not dispute that they owe a duty in marketing the sights, *see* MTD at 9-10, but only dispute whether under the facts here the harm that occurred was foreseeable, the Court need not undertake the analysis of whether to recognize a new duty under Texas law. *See, e.g.*, *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 619 (W.D. Tex. 2017) (listing factors). Even under that analysis, however, duty exists.

or omission was a substantial factor in bringing about the injury, and without it harm would not have occurred." *E.g.*, *Travis*, 830 S.W.2d at 98 (quotation marks omitted). "There can be concurrent proximate causes of an [injury]. All persons whose negligent conduct contributes to the injury, proximately causing the injury, are liable." *Id.*

As explained in Part III.B.1. above, the shooting was a foreseeable result of the defendants' conduct. Additionally, the proposed First Amended Complaint explains at length how the defendants' marketing and sale of the close-quarter battle sight were substantial factors in the carnage at Robb Elementary School. The "Holographic Weapon Sight [is] built for close-quarter engagements" and "allow[s] the shooter to quickly pick up and lock on a target." FAC ¶ 329. The Shooter used the "breach-ready" sight to do exactly that, bursting into Robb Elementary's classrooms and killing people. *Id.* ¶ 334. As a result, "the [defendants'] sight gave [the Shooter] both a practical tool and, in [the defendants'] words, increased 'confidence.'" *Id.* ¶ 352. Indeed, the increased "confidence" that the sight gives its users is one of the defendants' major selling points for the sight. *Id.* That was especially true for the Shooter. Before the shooting, the Shooter had never fired a firearm, let alone used one to kill another person. *Id.* ¶ 420. But using the close-quarter battle sight, the Shooter was able to recreate a scenario that he was deeply familiar with, and adept at: a point-and-shoot gaming experience. *Id.* ¶ 323. Additionally, the sight was also necessary for the Shooter to achieve the "look" – as a Call of Duty lone-gunman – that he desired to carry out the shooting. *Id.* ¶ 352. In short, the defendants' marketing and sale of the close-quarter battle sight contributed substantially to the loss of life on May 24, 2022. *Id.* ¶ 521. At the very least, on these facts, a reasonable jury could conclude that the defendants' negligence was a substantial factor in the plaintiffs' damages.

The defendants make three arguments against causation, all of which are unavailing. First, the defendants argue that the shooting was not a foreseeable result of their negligence. MTD at 11-12. For the reasons explained in Part III.B.1. above, that argument has no merit.

Second, although the defendants concede that their "sale of the Sight" was "part of the many circumstances involved in the Shooter's decision to commit" the shooting, MTD at 14, they argue that their conduct was not a substantial factor in the plaintiffs' harm, *id.* at 12-14. They rely on cases in which courts concluded that certain early events in complex chains of events were too remote from the ultimate damages to constitute a legal cause. *See id.* at 13. These cases are inapposite. To begin with, the defendants infer – against the allegations of the complaint – that the Shooter was not exposed to and influenced by any of their marketing ***after*** he purchased the sight. The facts say the opposite. The Shooter continued to visit the defendants' website after he purchased the sight. FAC ¶ 353. And he continued to be exposed to marketing up to the time of the Shooting. *Id.* ¶¶ 286, 346-51. Moreover, the manner in which the Shooter carried out the shooting mimicked the defendants' marketing, showing how strongly it influenced him and confirming that the marketing and sale of the sight were active and substantial factors in the shooting. The facts show that the sight was central to the Shooter committing the shooting. After ordering the sight, the Shooter checked the tracking page for his shipment and googled how long it would take to arrive. *Id.* ¶ 353. He did not commit the shooting until he had the sight installed on the Daniel Defense AR-15 – the exact loadout advertised by the defendants – even though he already had a separate AR-15 manufactured by Smith & Wesson and hundreds of rounds of ammunition. *Id.* ¶¶ 402, 405. Then, the Shooter used the sight exactly as the defendants had marketed it, to "breach" the classrooms of Robb Elementary School and "neutralize" his targets in a "close-quarter engagement[]." *Id.* ¶¶ 328-30.

In contrast, the cases the defendants rely on involved mere "conditions," which had ceased to be "active and efficient" causes. *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004) (cited at MTD at 13). Moreover, in all the cases cited by the defendants, causation was decided as a matter of law either through summary judgment, after the opportunity for discovery, or after trial. *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773 (Tex. 1995); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470 (Tex. 1991); *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794 (Tex. 2004); *Bell v. Campbell*, 434 S.W.2d 117 (Tex. 1968). The defendants also rely on *Lowy v. Daniel Def., LLC*, No. 1:23-CV-1338, 2024 WL 3521508 (E.D. Va. July 24, 2024), in which the district court, applying Fourth Circuit law, held that the plaintiffs' failed to sufficiently allege causation in another school shooting involving Daniel Defense.[6] However, the causation allegations in *Lowy* are materially different from (and pale in comparison to) the allegations here. In *Lowy*, the plaintiffs did not make "any allegation" that the defendants' advertising caused the shooting. 2024 WL 3521508, at * 3.[7] Here, however (and as explained above), the complaint alleges in detail how the defendants' marketing was a substantial factor in the shooting. The complaint here also alleges specific facts supporting the inference that the Shooter was exposed to the defendants' marketing through multiple platforms, and that the defendants were targeting him as a consumer. *See* FAC ¶¶ 286, 346-51, 353.[8]

---

[6] An appeal is currently pending before the Fourth Circuit. *See Lowy v. Daniel Defense, LLC*, No. 24-1822.

[7] The *Lowy* court also applied a Fourth Circuit standard – whether the "defendant's conduct had a 'determinative or coercive effect upon the action of someone else,'" 2024 WL 3521508, at *2 – that is not applicable here under governing Texas law.

[8] Additional contacts that the Shooter had with the defendants, and with their marketing, will be the subject of discovery.

Third and finally, the defendants argue that the shooting "was an intervening, superseding cause." MTD at 14. However, "if the likelihood that a third person may act in a particular manner is one of the hazards that makes the defendant negligent, that act (even if criminal or intentional) does not prevent the defendant from being liable." *Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 555 (Tex. App. – Houston 2018) (citing Restatement § 449). And it is settled that "the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence." *E.g.*, *Travis*, 830 S.W.2d at 98. As explained in Part III.B.1. above, the shooting was the foreseeable result of the defendants' negligence.[9] Moreover, the determination of the foreseeability of intervening criminal conduct rests with the jury. *See El Chico Corp.*, 732 S.W.2d at 314.

**C. The Plaintiffs Have Stated a Claim for Punitive Damages**

The defendants argue that the plaintiffs' request for punitive damages must be dismissed because "[t]he sale of the Sight to the Shooter is not remotely something that could be considered likely, *i.e.*, more probable than not, to result in serious injury to Plaintiffs." MTD at 18. Once again, the defendants ignore the allegations of the First Amended Complaint. The First Amended Complaint alleges in detail the manner in which the defendants knowingly and intentionally marketed an implement of war, the "singular purpose" of which was to "neutralize" other human beings in assault, to teenagers. *See* FAC ¶¶ 331-52. The defendants did this for profit. They

[9] The defendants cite several cases in which courts held that criminal conduct involving a firearm was a superseding or intervening cause. *See* MTD at 15-16. In each of these cases, however, either the plaintiffs failed to allege causation; *see Johnson v. Walker*, No. 09-22-00255-CV, 2023 WL 2182299, at *6 (Tex. App. Feb. 23, 2023); the original negligence merely created a condition, rather than an active and efficient cause; *see id.*; or the criminal conduct was not foreseeable under the circumstances, *see Cowart v. Kmart Corp.*, 20 S.W.3d 779 (Tex. App. – Dallas 2000, pet. denied); *Chapman v. Oshman's Sporting Goods, Inc.*, 792 S.W.2d 785 (Tex. App. – Houston [14th Dist.] 1990, writ denied); *Holder v. Bowman*, No. 07-00-0126-CV, 2001 WL 62596 (Tex. App. – Amarillo Jan. 25, 2001, pet. denied). In short, these cases are inapposite.

exposed the plaintiffs to the likelihood of catastrophic harm to increase their market share. The Robb Elementary School Shooting was the foreseeable result. Without question, the plaintiffs have stated a claim for punitive damages. *See* TEX. CIV. PRAC. & REM. CODE §§ 41.001(11), 41.003(a).

### D. PLCAA Does Not Apply to the Plaintiffs' Claims

PLCAA prohibits "qualified civil liability actions," which it defines as an action "against a manufacturer or seller of a qualified product … for damages … resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" 15 U.S.C. § 7903(5)(A). A "qualified product" is "a firearm … or ammunition … or a component part of a firearm or ammunition …." *Id.* § 7903(4). PLCAA is inapplicable to the plaintiffs' claims against the defendants because the plaintiffs do not allege a "qualified civil liability action" under PLCAA. First, the defendants are not protected "manufacturers" under PLCAA. Second, the defendants' close-quarter battle sight is not a protected "qualified product" under PLCAA.[10]

#### 1. The Defendants Are Not "Manufacturers" of the Close-Quarter Battle Sight Under PLCAA

PLCAA's protections apply only to "manufacturer[s]" or "seller[s]." 15 U.S.C. § 7903(5)(A). The defendants do not claim to be protected "sellers" under PLCAA; they claim to be protected "manufacturers." *See* MTD at 6. However, the plain language of PLCAA makes

[10] The defendants argue that "PLCAA provides complete and substantive immunity from suit, not just a defense from liability." MTD at 4. Nowhere in its plain language does PLCAA state that it provides immunity from suit. *See, e.g.*, *Doyle v. Combined Sys., Inc.*, No. 3:22-CV-01536-K, 2023 WL 5945857, at *4 (N.D. Tex. Sept. 11, 2023) ("The Court agrees with the Second Circuit that the PLCAA's prohibition on qualified civil liability actions is not jurisdictional because Congress did not clearly intend the PLCAA to limit the jurisdiction of the federal and state courts."). As *Doyle* finds, PLCAA is a defense, not an immunity.

clear that the defendants are not "manufacturers" of the close-quarter battle sight, and therefore are not entitled to PLCAA protection.

Whether a defendant is a "manufacturer" under PLCAA is determined on a product-by-product basis. A defendant may be a protected "manufacturer" with respect to one qualified product, while simultaneously not qualifying as a "manufacturer" of another qualified product. PLCAA's plain language makes this product-by-product application clear: "The term 'manufacturer' means, ***with respect to a qualified product***, a person who is engaged in the business of manufacturing ***the product*** in interstate or foreign commerce and ***who is licensed to engage in business as such a manufacturer under chapter 44 of Title 18***." 15 U.S.C. § 7903(2) (emphasis added). The defendants argue that they are protected manufacturers because they hold a "type 07 (manufacturer of firearms) federal firearms license ('FFL') … for the premises located at 46900 Port Street, Plymouth, MI 48170." MTD at 6 n.3. The defendants misunderstand PLCAA and the federal firearms licensing regime.

First, the FFL license the defendants point to is registered only to EOTech, LLC. It is not registered to Project Echo Holdings, LLC. The defendants do not argue that Project Echo Holdings, LLC has an FFL (because it does not).[11] For that reason alone, Project Echo Holdings, LLC is not "licensed to engage in business as such a manufacturer under chapter 44 of Title 18," as required under PLCAA's definition of a "manufacturer," and, accordingly, Project Echo Holdings, LLC does not receive any PLCAA protection. 15 U.S.C. § 7903(2).

Second, PLCAA makes clear that to qualify as a protected manufacturer of a product, a defendant must be "with respect to" the product, "engaged in the business of manufacturing ***the product***" and be "***licensed*** to engage in business ***as such a manufacturer*** under chapter 44 of

[11] No license is required to manufacture or sell firearms sights.

Title 18." 15 U.S.C. § 7903(2) (emphasis added). Thus, to be a PLCAA manufacturer of the sight, EOTech, LLC must be "engaged in the business of manufacturing the [sight]" and "licensed to engage in business as such a manufacturer." *Id.* That is not the case. EOTech, LLC has a "type 07" "manufacturer of firearms" license. *See* 27 C.F.R. § 478.41(a). The close-quarter battle sight is not a firearm. The governing law defines "firearm" as "[a]ny weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device …." 27 C.F.R. § 478.11; 18 U.S.C. § 921(a)(3) (same). The defendants' close-quarter battle sight clearly does not fall within the definition of "firearm," and the defendants do not argue that it does. *See* MTD at 6-7 (arguing only that the close-quarter battle sight is a "component part" of a firearm). Moreover, even though EOTech, LLC is licensed to manufacture "firearms," it does not manufacture any firearms, so it is not even "engaged in the business of manufacturing" firearms. 15 U.S.C. § 7903(2). In sum, EOTech, LLC is not a licensed manufacturer "with respect to" the close-quarter battle sight. PLCAA, therefore, provides no protection to EOTech, LLC, regarding the plaintiffs' claims.

### 2. The Close-Quarter Battle Sight Is Not a PLCAA "Qualified Product"

Even if the defendants were protected "manufacturers" under PLCAA – and they are not – PLCAA does not apply to the plaintiffs' claims against them for the independent reason that the close-quarter battle sight is not a PLCAA "qualified product." For the plaintiffs' claims against the defendants regarding the close-quarter battle sight to constitute a "qualified civil liability action" under PLCAA, the sight must be a "qualified product" under PLCAA. *See* 15 U.S.C. § 7903(5)(A) (defining "qualified civil liability action"). A "qualified product" is "a firearm … or ammunition … or a component part of a firearm or ammunition …." *Id.* § 7903(4).

The defendants do not dispute that the close-quarter battle sight is not a "firearm" or "ammunition." They claim that it is a "component part of a firearm." *See* MTD at 6-8. The plaintiffs have already briefed in detail the reasons why the close-quarter battle sight is ***not*** a component part under PLCAA. *See* ECF No. 12, Mtn. to Remand at 13-17; ECF No. 29, Reply ISO Remand at 10-12; ECF No. 45-1, Resp. to Oasis' Mtn. to Dismiss at 25-33. To summarize briefly here, the ordinary meaning of "component part" is something that plays an integral or "*essential*" role. *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018) (citing Merriam-Webster Collegiate Dictionary 255, 267 (11th ed. 2003) (emphasis added). A sight does not play an integral or necessary role in the operation of the underlying weapon: discharging a round of ammunition. It is an accessory that impacts the shooter's experience, not the weapon's function. *See Prescott*, 341 F. Supp. 3d at (noting that "a rifle is fully functional[]" "without sights"). The fact that a close-quarter battle sight – let alone any sight – is not an "essential" part in the operation of a firearm is confirmed by the fact that Daniel Defense sells – and sold to the Shooter – its AR-15s ***without any sights***. *See* ECF No. 45-1, Resp. to Oasis' Mtn. to Dismiss at 25-33.

The defendants argue that the close-quarter battle sight is a component part of an AR-15 based on an absurdly broad proposed definition of "component." Ignoring dictionary definitions from the time that PLCAA was passed, the defendants cite to a present-day definition of the noun, "component' as "a part that combines with other parts to form something bigger," MTD at 7. This definition is clearly overbroad. Under this definition, anything that is capable of being "combine[d]" with a firearm would be a component part. The "tactical bottle openers" sold by

some manufacturers[12] – beer bottle openers that can be mounted on the rail, or grip, of an AR-15 – would be PLCAA protected component parts under this definition. A GoPro camera mounted on a firearm[13] would be a PLCAA protected component part under this definition. A five-dollar flashlight from a convenience store duct-taped to an AR-15's rail would be a PLCAA protected component part under this definition. ***Anything*** that could be clipped, taped, glued, tied, or bolted onto a firearm would be a PLCAA protected component part under the defendants' definition. This definition is not, and cannot be, what Congress intended.[14]

The defendants argue that "The ATF's Guidebook - Importation & Verification of Firearms, Ammunition, and Implements of War … identifies the sights as 'component parts' of a semiautomatic rifle." MTD at 7. Rather than citing to any portion of the Guidebook, the defendants just attach the entire 104-page document as an exhibit to their motion. The plaintiffs in sister cases to this case have addressed the inapplicability of the Guidebook in previous briefing and plaintiffs incorporate that argument; *see Rubio v. Daniel Defense, LLC*, No. 2:24-cv-00069 (ECF No. 29 at 11-12; ECF No. 45-1 at 25-33). The plaintiffs also object to the court

---

[12] *See, e.g.*, *(TBO) TACTICAL BOTTLE OPENER*, DoubleStar, https://doublestarusa.com/tbo-tactical-bottle-opener.html.

[13] *See, e.g.*, *Shotgun Mount for Gopro – Works on All Gun Barrells – Rifles and Scopes Too*, Amazon, https://www.amazon.com/Shotgun-Mount-Gopro-Barrells-Rifles/dp/B00Q7LMYW8

[14] The defendants argue that "Courts have previously confirmed the straightforward conclusion that such parts are component parts for purposes of the PLCAA." MTD at 7. The defendants misrepresent the two cases they cite. In *Prescott*, 341 F. Supp. 3d 1175, the court concluded that a bump stock was a component part because "a 'stock' is a component part of a rifle" and a bump stock "replaces the existing stock" and therefore becomes the rifle's stock. 341 F. Supp. 3d at 1189. The *Prescott* court also noted a Federal Circuit decision that ***sights are mere accessories*** because guns "will fire without the sights." *Id.* at 1190. *Lowy*, 2024 WL 3521508, simply applied *Prescott*'s logic to determine that magazines and grips are component parts because they "substitute[] the original components of the[] firearm …." *Id.* at *3. This reasoning is inapplicable to the present case, as the close-quarter battle sight did not replace any existing sights or other parts of the DDM4v7. It was an add-on accessory.

considering this document, which is outside of the record and does not meet the standard for taking judicial notice.

Finally, the defendants argue that "the ATF's Firearm Component Identification Guide … identifies sights as being component parts of rifles used for aiming." MTD at 7-8. Again, the defendants do not cite to any part of the Identification Guide, but instead attach the entire 79-page document as an exhibit.[15] As with the Guidebook, the plaintiffs object to the Court considering this document outside of the record. In any case, the first page of the Identification Guide states, "[t]his guide is neither intended to be a legal 'guidance document' nor set forth policy on any statutory, regulatory, or technical issues. Furthermore, it ***should not be relied upon as an interpretation of any statute or regulation*** or used for evidentiary value." Identification Guide at i (emphasis added). The defendants have either not read the Identification Guide or chose not to disclose this highly pertinent disclaimer to the Court. The plain language of PLCAA and the Gun Control Act make clear that a close-quarter battle sight is not a component part of an AR-15. The analysis begins and ends there.

### E. Project Echo Holdings, LLC is Directly Liable and Veil Piercing Is Not Required

The defendants claim that "Plaintiffs' sole reason for naming Project Echo as a defendant is that it is the parent company of EOTECH" and argue that the plaintiffs have not stated a claim for veil piercing. MTD at 18-20. The defendants misread the plaintiffs' allegations. The plaintiffs allege that both EOTech, LLC and Project Echo Holdings, LLC were ***directly negligent*** in marketing and selling the close-quarter battle sight to the Shooter. *See* FAC ¶ 64 (stating that as

---

[15] If the defendants use their reply to point to particular potions of the Identification Guide, the plaintiffs object to the court considering those arguments raised for the first time in reply, which would unfairly prejudice the plaintiffs and deprive them of an opportunity to respond. The same is true for the defendants' reliance on the Guidebook.

used in the complaint, "EOTech" refers to EOTech, LLC; Project Echo Holdings, LLC; and Koucar Management, LLC); ¶¶ 322-56; 510-25 (allegations against EOTech, LLC; Project Echo Holdings, LLC; and Koucar Management, LLC). The plaintiffs do not bring claims against Project Echo Holdings, LLC because it is the parent company of EOTech, LLC. They bring claims against Project Echo Holdings, LLC because its own negligence proximately caused them catastrophic harm. The defendants' arguments regarding veil piercing are irrelevant.[16]

### F. Alternatively, the Court Should Grant the Plaintiffs Leave to Amend

"[D]ismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2002). The Fifth Circuit's "cases support the premise that [g]ranting leave to amend is especially appropriate … when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (quotation marks omitted). This is so, "even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading," with the result being that "leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim." Wright & Miller § 1357. Should the Court dismiss any portion of the First Amended Complaint as inadequately pled, the plaintiffs request leave to amend.

[16] It is notable that the Daniel Defense defendants (Daniel Defense, LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc.) understood that the plaintiffs brought direct negligence claims against all three of them and did not make the irrelevant veil piercing arguments the defendants make here. *See* ECF No. 31, Daniel Defense's Mtn. to Dismiss.

**CONCLUSION**

For all these reasons, the motion to dismiss must be denied.[17]

Respectfully Submitted,

**THE PLAINTIFFS**,

Respectfully Submitted,

/s/ Jamal Alsaffar
JAMAL ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
LAURIE HIGGINBOTHAM
lhigginbotham@nationaltriallaw.com
Texas State Bar #50511759
STEVEN HASPEL
shaspel@nationaltriallaw.com
Texas State Bar #24109983
NATIONAL TRIAL LAW
1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)

Attorneys for all Plaintiffs except Salinas

DAVID M. ANDERSON
danderson@ccatriallaw.com
Texas State Bar #24064815
Federal I.D. 985644

[17] The plaintiffs assert aiding and abetting claims, *see* FAC ¶¶ 494-505, which they intend to pursue in state court following remand. The plaintiffs recognize that if the case were to remain in this Court, which it should not, Fifth Circuit precedent would require the Court to dismiss these claims. *See DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018).

Case 2:24-cv-00073-AM Document 71 Filed 01/12/26 Page 27 of 27

CARRIGAN & ANDERSON, P.L.L.C.
101 N. Shoreline Blvd., Ste. 420
Corpus Christi, TX 78401
(361) 884-4433 (o)
(361) 884-4434 (f)

Attorneys for Plaintiffs Ruiz, Jimenez, Moreno, Reyes, Rubio, Torres, and Arriola

GUY CHOATE
gchoate@webbstokessparks.com
Texas State Bar # 04212410

CARLOS RODRIGUEZ
crod@webbstokessparks.com
Texas State Bar # 24041804
WEBB, STOKES & SPARKS
314 W. Harris Avenue
San Angelo, TX 76903
(325) 653-6886 (o)
(325) 655-1250 (f)

Attorneys for Plaintiff Garcia

/s/ Charles E. Soechting, Jr.
CHARLES E. SOECHTING, JR.
csoechting@sgptrial.com
Texas State Bar # 24044333
SHREEDHAR R. PATEL
spatel@sgptrial.com
Texas State Bar # 24074864
SIMON GREENSTONE PANATIER
901 Main, Suite 5900
Dallas, TX 75270
(214) 276-7680 (o)
(214) 276-7699 (f)

Attorneys for Plaintiff Salinas